# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDERICK EIMERS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-113 |
| | ) | |
| v. | ) | Judge Sean McLaughlin |
| | ) | Magistrate Judge Susan Baxter |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

### II. REPORT

**A. BACKGROUND**

1. Procedural

Frederick Eimers ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). Plaintiff filed for benefits on June 25, 2008. (R. at

156 – 67).[1] Plaintiff initially claimed that he was unable to work as a result of left hip replacement, left knee arthroscopy, right shoulder arthroscopy, right knee pain, lower back pain, and generalized arthritis, and that his alleged disability began on April 7, 2008[2]. (R. at 156 – 67, 178). Plaintiff was denied benefits under the Act. (R. at 1 – 5, 11 – 26, 54 – 62). Having exhausted all administrative remedies, this matter now comes before the court on cross motions for summary judgment. (ECF Nos. 10, 14).

2. <u>General</u>

Plaintiff was born on February 15, 1961, and was forty-nine years of age at the time of his administrative hearing on May 10, 2010. (R. at 31). Plaintiff shared a home with his teenage son and close personal friend. (R. at 43). He attended his son's sporting events when possible. (R. at 43). Plaintiff graduated from high school, but had no post-secondary or vocational education. (R. at 32). He had just completed his first semester of classes in a hotel/ restaurant institutional management program, and was beginning his second semester, but claimed that he was taking a reduced course load because he had difficulty sitting through his classes. (R. at 32). He explained that his program allowed him to complete his first semester courses from home, due to his difficulty sitting through the last month-and-a-half at school. (R. at 32).

Plaintiff has not worked since 2004, when he underwent hip, knee, and shoulder surgery. (R. at 179, 217, 321, 337). His last job was as an "operator" for a brake parts company. (R. at 179, 217). Prior to that, Plaintiff was a manager at an inn/restaurant. (R. at 079). Recently, Plaintiff attempted to work as a caretaker for a disabled friend, but was unable to continue due to

---

[1] Citations to ECF Nos. 6 – 6-9, 7 – 7-7, the Record, *hereinafter*, "R. at __."

[2] Plaintiff's June 25, 2008 applications for DIB and SSI both indicated that Plaintiff's alleged disability began on June 21, 2008. (R. at 156 – 67). Defendant's brief also treated this as the alleged onset date. (ECF No. 15 at 2 – 3). However, the ALJ indicated that Plaintiff's alleged onset date was April 7, 2008, and Plaintiff agreed during his administrative hearing and in his briefing. (R. at 33; ECF No. 11 at 8). The Court will, therefore, treat April 7, 2008 as Plaintiff's disability onset date for purposes of this Report and Recommendation.

2

the strenuous nature of the work. (R. at 33). Plaintiff experienced difficulty moving his friend and transporting him to appointments. (R. at 33). Plaintiff claimed that he experienced pain when sitting, and could not walk distances because of pain. (R. at 34 – 35). He felt the most relief when lying down with his feet elevated, but otherwise continually changed positions to minimize discomfort. (R. at 34 – 35). On average, Plaintiff rated his pain as 7 on a scale of 1 through 10. (R. at 36). It often impeded his ability to maintain concentration. (R. at 36). Plaintiff claimed not to use narcotic medication because of his history of alcohol abuse. (R. at 38 – 39). He was able to go grocery shopping, wash dishes, cook, and complete household chores with help from his son. (R. at 44).

3. <u>Treatment History</u>

Plaintiff contends that he has been unable to work since April 7, 2008 (R. at 33) as a result of his hip replacement, left knee arthroscopy, right shoulder arthroscopy, pain in the right knee and lower back, and generalized arthritis. (R. at 156-67, 178). Treatment for these conditions before the alleged date of disability have included a total left hip replacement in January 2004 (R. at 321, 389, 496), arthroscopic surgery to left knee (January 2004) (R. at 321, 389, 496) as well as repair of the right rotator cuff (February 2005) (R. at 636).

Plaintiff was examined by James Steele, D.O. of McClelland Family Practice, his primary care physician, on June 25, 2008. Plaintiff explained that he slipped while carrying an eighty pound air conditioning unit and experienced immediate and severe radiating lower back pain. Dr. Steele noted some tenderness on palpation of the paraspinal region of Plaintiff's lower back but no muscle spasm was found. Plaintiff was diagnosed with lumbar strain and provided with pain medication but was otherwise cleared for light duty work. Plaintiff was referred to Dr. Cortina, an orthopedic physician, for consultation. (R. at 401-02).

3

On July 28, 2008, Dr. Steele examined Plaintiff's shoulders following complaints of shoulder pain Dr. Steele noted tenderness and abnormal motion of the shoulders but otherwise found that they appeared normal, exhibited no crepitus, did not spasm, and showed full strength. Plaintiff was provided with pain medication and was referred to Dr. Cortina. (R. at 399-400). (The medical records indicate that despite the referrals, Plaintiff had not seen Dr. Cortina in over a year.) Also on July 28, 2008, Dr. Steele signed a disability form indicating the Plaintiff was temporarily disabled until the following day, July 29th, when he had an appointment scheduled with the orthopedic doctor. (R. at 406).

On August 28, 2009, Plaintiff was examined by Dr. Steele. Plaintiff reported that he was "doing well." The records indicate that Plaintiff had an orthopedic appointment that day and that Dr. Steele could "give short term disability, the[n] defer to orthopedics." Further, the record indicates that Plaintiff "need[ed] to secure disability from orthopedics, no medical reason not to work." (R. at 397-98). On this date, Dr. Steele signed a disability form indicating that Plaintiff was temporarily disabled until September 15, 2008. (R. at 453).

On September 11, 2008, Plaintiff was treated by Vamsi Singaraju, M.D. at Hamot Medical Center's Orthopedic Clinic. He complained of right knee pain lasting over a year prior to the exam. He rated the pain as 4 out of 10. The medical records note that Plaintiff's left knee and right shoulder had previously been scoped in 2004. Plaintiff had a positive patellar grind test and x-rays revealed mild degenerative joint disease along the knee. Plaintiff was diagnosed with patellofemoral pain syndrome and was advised to engage in physical therapy. Plaintiff declined injection therapy and was advised to continue his use of over-the-counter medications for pain relief. (R. at 332, 496-98).

4

On or about September 17, 2008, Plaintiff reported to a local emergency room complaining of pain following a fall. X-rays showed degenerative changes involving the C5-6 and C6-7 disc spaces and flattening of the cervical lordosis. Plaintiff was diagnosed with cervical strain and whiplash. (R. at 418-27).

Plaintiff was seen by Dr. Steele on September 24, 2008 as a follow-up to the emergency room visit. Upon examination, Plaintiff's shoulders were reported to look normal, showed no instability, and did not elicit pain during an impingement test nor show abnormal motion. Motor strength and shoulder strength were reported as normal as was Plaintiff's gait and stance. Medication was prescribed for pain and Plaintiff was advised to apply heat and ice as needed. (R. at 392-93).

Plaintiff underwent a physical therapy evaluation on October 20, 2008, but never returned for follow-up appointments. A discharge note was entered on November 26, 2008, indicating that Plaintiff's "status to date – unknown." (R. at 522-23).

On December 1, 2008, Dr. Steele examined Plaintiff during a follow-up visit and noted Plaintiff's hips and knees appeared normal. Plaintiff's knees appeared normal, showed no tenderness, had no spasms, and had normal movement. Plaintiff's gait and stance appeared normal and Plaintiff was advised to use over-the-counter anti-inflammatories for pain relief. (R. at 389-91). Dr. Steele noted however that Plaintiff had not been complying with instructions to take the prescribed pain medication as directed. (R. at 389).

On January 13, 2009, Plaintiff was examined by the orthopedic specialist during a follow-up visit for his right knee pain. Dr. Singaraju indicated that he had diagnosed Plaintiff with patellofemoral syndrome and had ordered physical therapy and indicated that Plaintiff was doing "remarkably well." Plaintiff complained about the sudden onset of left hip pain three

5

months earlier. This pain was persistent but non-specific and did not have any particular triggers. Dr. Singaraju observed that Plaintiff could stand straight-legged without pain but experienced pain when moving his hip. Examination of the right knee showed no abnormalities. (R. at 445-48). Dr. Singaraju recommended further discussion with Dr. Lyons about the possibility of an infection in the hip. Plaintiff was advised to refrain from physical therapy and use a cane or crutches and schedule a bone scan. (R. at 448).

Plaintiff was examined on or about February 10, 2009, by Nicholas Crosby, M.D. of Hamot's Orthopedic Clinic. Dr. Crosby indicated at that time that Plaintiff reported his left hip pain improving, but that the right knee pain had worsened. An examination found that Plaintiff had very little, if any, effusion in the right knee, no pain with movement of the left hip, and the straight leg standing test was negative. There were no further abnormalities noted and Plaintiff was prescribed anti-inflammatory medication and advised to continue with physical therapy two to three times per week to attempt rehabilitation. (R. at 442-44, 522-23).

Plaintiff was seen on or about March 26, 2009 by Gregory Daut, M.D. of Hamot's Orthopedic Clinic. Plaintiff could not describe his left leg pain and could not identify exacerbating or relieving factors. Plaintiff denied any back pain. Plaintiff had failed to engage in physical therapy sessions as he had been advised. Dr. Daut noted that Plaintiff was not experiencing muscle weakness or atrophy and that while Plaintiff had an antalgic gait, he could walk on his heels and toes without difficulty. Plaintiff was again advised to engage in physical therapy to focus on stretching, posture, core strengthening, and conditioning with modality and was provided with anti-inflammatory medication. (R. at 480-82).

Plaintiff returned to the Orthopedic Clinic on or about May 14, 2009 complaining of right knee and left hip pain. X-rays revealed narrowing in the lumbar area. It was noted that Plaintiff

6

did not attend the recommended physical therapy sessions. Physical therapy was again prescribed and patient was advised to undergo an MRI of the spine. Plaintiff was offered a corticosteroid injection to the right knee, but declined it. (R. at 477-78).

Plaintiff was incarcerated for approximately 90 days, beginning about June 4, 2009. (R. at 40).

On September 9, 2009, Plaintiff was examined by Dr. Steele for complaints of pain in the left hip, right knee, and lower back. Dr. Steele noted that Plaintiff was taking anti-inflammatory medications for relief. Plaintiff indicated that his discomfort was substantial and that he was willing to consider pain management. Dr. Steele gave Plaintiff a referral to an orthopedic physician. (R. at 647-48, 652).

On or about September 22, 2009, Plaintiff was examined by Dr. Singaraju for hip pain. Plaintiff complained of unbearable left hip pain which persisted even at rest. Plaintiff explained that he had done well for four years following his hip surgery, but had experienced the onset of pain in his left hip for over a year with a worsening of the condition. Plaintiff had not undergone the physical therapy previously prescribed and had not attended a scheduled MRI of his spine due to his short incarceration. X-rays of Plaintiff's back showed severe lumbar narrowing at the L5-S1 level of the spine as well as degenerative changes at L1-L3. Dr. Singaraju noted gross wasting of the left leg and Plaintiff had weakness in the left buttock, an abnormal gate, and tenderness in the lower back. Plaintiff requested narcotic pain medication and Dr. Singaraju provided him with a prescription. Plaintiff was "counseled stringently" to get an MRI of his spine and to begin physical therapy. (R. at 626-28).

Plaintiff was again seen by Dr. Singaraju at the Orthopedic Clinic on or about October 8, 2009. Plaintiff claimed that his hip pain had not improved much and requested another

7

prescription for narcotic pain medication. Plaintiff's left leg was again noted to be smaller than the right but Plaintiff claimed that this had been the case throughout his life. Dr. Singaraju noted that an MRI of the lower spine revealed the existence of a lateral recess impingement at two separate points. Plaintiff was advised to consult a neurologist and to see a pain management specialist. Dr. Singaraju provided Plaintiff with another prescription for narcotic pain medication, but informed Plaintiff that no further medication of this type would be available from the clinic and that the final prescription was only given in order to give Plaintiff time to see a neurologist and pain specialist and because the MRI demonstrated L5 root irritation. Plaintiff had not complied with the recommendation to seek physical therapy as advised. It was further noted that there was no hip pathology that necessitated or justified the use of narcotic mediation. (R. at 623-25).

Plaintiff was seen by Dr. Steele on October 12, 2009, for back pain. Plaintiff's MRI results were reviewed and Plaintiff was referred to a neurologist. (R. at 645).

Plaintiff was seen by Dr. Steele on October 29, 2009, for continued complaints of back, hip and leg pain. Plaintiff requested a referral to Dr. Cortina, because he did not like the doctors at Hamot Orthopedic Clinic. Dr. Steele referred Plaintiff for a consult with a neurologist and a pain management specialist. Plaintiff requested an injection for pain because the "doctor who was prescribing Vicodan will not prescribe" any more. The doctor noted that "disability papers filled out till 1/5/10 to allow time for consult and treatment." (R. at 643-44).

Plaintiff was examined by neurologist Bruce Wilder, M.D. on November 17, 2009. Dr. Wilder observed that Plaintiff ambulated with a prominent limp favoring his left side, his lumbar lordotic curve was normal, he could walk on his heels and toes, there was little weakness detected in the lower extremities, sensation was intact, and reflexes were reduced. Dr. Wilder

noted that a lumbar spine MRI showed multi-level degenerative disease, extensive degenerative change at L4-L5, possible synovial extrusion, and possible pars defects at L5. Plaintiff was diagnosed with hip joint pain, lumbar disc degeneration, and congenital lumbosacral spondylosis. Plaintiff was advised to have additional x-rays, an EMG study, and an evaluation by the physician who replaced his hip (Dr. Cortina) before further action could be considered. (R. at 588-90).

Plaintiff underwent an EMG nerve conduction study on November 30, 2009. The study revealed normal nerve responses through the bilateral lower extremities. The results were considered normal and there was no evidence of neuropathy or lumbosacral radiculopathy. (R. at 656-57).

It is noted that Plaintiff was scheduled for surgery on his left hip on February 2, 2010 (R. at 618) but that this surgery was cancelled.[3] Epidural steroid injections and physical therapy were ordered for Plaintiff on April 8, 2010. (R. at 663-64).

4. Functional Capacity Assessments

On January 3, 2008, John C. Kalata, D.O. completed an internal medicine examination report on behalf of the Bureau of Disability Determination. Plaintiff stated that his left hip had deteriorated to the point that it was replaced. Despite undergoing surgery, Plaintiff rated his left hip pain as 6 or 7 on a scale of 1 to 10. He claimed that the physician who had replaced his hip had informed him that more surgery on the left hip may be necessary in the future. Plaintiff also experienced left knee pain. He explained that he had undergone left knee arthroscopy. As a result of placing more weight on his right knee due to pain in the left, his right knee had allegedly

---

[3] No reason for the cancellation of this surgery can be found in the papers before this Court.

begun to hurt more recently. Plaintiff also complained of pain in the right shoulder, as well as pain in the upper and lower back. (R. at 320 – 30).

Dr. Kalata observed that Plaintiff walked with a limping gait, and favored his left side, but that he did not use an assistive device to ambulate. His station was abnormal. Plaintiff no longer took prescription pain medication, and instead relied upon Aleve for pain relief. Plaintiff's surgical history included left hip replacement, repair of a right rotator cuff tear, diagnostic shoulder arthroscopy, and left knee arthroscopy. Testing revealed that Plaintiff's reflexes in his upper extremities was 2/4, and was 0/4 in the lower extremities. He could only raise his legs approximately fifty degrees, he had full range of motion in the upper extremities, he winced in response to alleged pain in the right shoulder, and his upper thoracic and lumbar spine had some curvature. Plaintiff's motor power in his arms was normal. No muscle atrophy was noted. *Id*.

Dr. Kalata diagnosed ambulatory dysfunction, status post left hip replacement with chronic pain, chronic pain right knee/ degenerative joint disease, status post right rotator cuff repair surgery/ intermittent and shooting pain, unstable lower back, and curvature of the upper thoracic and lower lumbar spine. (R. at 324-25). In terms of specific functional limitations, Dr. Kalata concluded that Plaintiff could only occasionally bend, kneel, and climb, and could never stoop, crouch, and balance. (R. at 327– 28). Reaching would be painful, and Plaintiff would need to avoid heights, moving machinery, and vibration. He could frequently lift and carry 2 – 3 pounds, and occasionally lift and carry 10 pounds. He could stand and walk up to one hour in an eight hour work day, and had no limitation in his ability to sit. Pushing and pulling with the upper and lower extremities would be limited by pain. *Id*.

A Physical Residual Functional Capacity Assessment ("RFC") was completed by state agency evaluator Gregory P. Mortimer, M.D. on October 31, 2008. (R. at 338 – 45). Based upon his review of the record, Plaintiff's impairments included a primary diagnosis of lumbar sprain, and secondary diagnoses of patellofemoral pain syndrome, degenerative changes of the right knee, history of total left hip arthroplasty, history of right shoulder arthroscopy, and history of bilateral knee arthroscopies. (R. at 338 – 45). Plaintiff's specific functional limitations as a result of these impairments included the ability to lift and carry no more than 10 pounds occasionally and significantly less than 10 pounds frequently, to walk and stand no more than two hours of an eight hour work day, to sit approximately six hours, and to occasionally climb, balance, stoop, and crouch. (R. at 338 – 45). Plaintiff could never kneel or crawl. (R. at 338 – 45).

Dr. Mortimer justified his conclusions by noting Plaintiff's ability to ride in a car, do some shopping, and do some household chores. (R. at 338 – 45). Dr. Mortimer studied examinations from January, June, July, and September 2008, and also found that Plaintiff's treatment had been conservative in nature, he had not been attending physical therapy as advised, he did not require an assistive device to walk, he did not take prescription pain medications, and he had not had any surgery scheduled for his knees, shoulders, or back. (R. at 338 – 45). The opinion of Dr. Steele – Plaintiff's treating medical source – was that Plaintiff had the capacity to engage in light work. (R. at 338 – 45). Dr. Mortimer went on to explain that Dr. Kalata's opinion, while mostly consistent with the medical record, lacked support when indicating that Plaintiff could not stoop, crouch, or balance, and could not stand or walk for more than one hour. (R. at 338 – 45).

**B.     ANALYSIS**

1. <u>Standard of Review</u>

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The

---

[4]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5]     Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

2. Discussion

The ALJ determined that Plaintiff suffered severe medically determinable impairments in the way of degenerative disc disease, status post left hip replacement, left knee impairment, right knee impairment, right shoulder impairment, and arthritis. (R. at 16). In spite of said impairments, the ALJ concluded that Plaintiff was capable of sedentary work. (R. at 17). However, such work would need to allow Plaintiff to sit for 45 minutes, stand and stretch for 2 – 3 minutes, and then stand for 15 minutes, would need to be limited to simple, routine, repetitive work, not require a fast pace due to the impact of pain on Plaintiff's ability to concentrate, and must not involve crouching, crawling, or climbing, or more than occasional bending, stooping, or balancing. (R. at 17). Based upon the testimony of a vocational expert, the ALJ determined that even with such limitations, Plaintiff would be eligible for a significant number of jobs available in the national economy. (R. at 20 – 21). Plaintiff was, therefore, denied DIB and SSI.

Plaintiff objects to the decision of the ALJ on a number of levels. His first point of contention is that the ALJ's hypothetical and RFC assessment, as formulated, precluded Plaintiff from all full-time work. (ECF No. 11 at 5). Plaintiff next argues that the ALJ erred in according little weight to the findings of consultative examiner Kalata. (ECF No. 11 at 6). Third, new evidence in the form of x-rays of Plaintiff's right knee and cervical spine should be considered

by this Court, and allegedly necessitates a remand. (ECF No. 11 at 7). Finally, Plaintiff asks this Court to review the determination of the Appeals Council, arguing that they committed reversible error by failing to find Plaintiff disabled on account of his age. (ECF No. 11 at 8). For the following reasons, this Court finds Plaintiff's arguments unpersuasive.

Plaintiff's first argument is unavailing because he presents no record evidence – or evidence of any sort – to support his conclusion. The ALJ indicated in his hypothetical and RFC that Plaintiff would need to stand and stretch for 2 – 3 minutes within a 45 minute period. (R. at 17, 47). The vocational expert at Plaintiff's administrative hearing considered this portion of the hypothetical with the other enunciated limitations and still concluded that a significant number of jobs existed in the national economy for which Plaintiff qualified. (R. at 47 – 48). Plaintiff calculated that such brief breaks would amount to – at most – 32 minutes of "unscheduled breaks." (ECF No. 11 at 5). According to Plaintiff, this constituted 7.6 to 8.2 percent of the work day, and such an amount of time "off-task" would not be tolerated by employers. (*Id.* at 5 – 6). Plaintiff bases this assumption upon what "most vocational experts in disability claims" would have stated. (*Id.*).

However, what Plaintiff's argument lacks is proof. He presented no proof that the vocational expert's testimony was incorrect, and he presented no proof that other vocational experts would have found differently. Additionally, when Plaintiff had the opportunity to question the vocational expert during his administrative hearing, he declined to do so. (R. at 49). Specifically:

    ALJ:        Mr. Wahl, do you have any questions for the vocational expert?

    ATTY:      No, not given your hypotheticals.

(R. at 49). While at Step 5 the ALJ has the responsibility of demonstrating that substantial gainful employment for which Plaintiff qualifies exists, it is always Plaintiff's burden to prove that he is unable to engage in any work. Here, Plaintiff has failed to demonstrate why the ALJ's reliance upon the vocational expert was without substantial evidence. The Court will not, therefore, remand for this issue.

Plaintiff's second argument similarly fails. While the ALJ's RFC was not fully consistent with Dr. Kalata's findings, it was generally more limited – relegating Plaintiff to only sedentary work. (R. at 17). Although Plaintiff faults the ALJ for not being more specific with respect to his justification for giving little weight to Dr. Kalata's limitations findings, Plaintiff does not specify which of Dr. Kalata's findings should have received more weight, and why.[6] (ECF No. 11 at 6 – 7). Plaintiff fails to provide the Court with evidence indicating that Dr. Kalata's limitations would have precluded Plaintiff from working, even if given full consideration. Plaintiff also attempts to rely upon blanket assertions that "new and material" evidence, as well as Dr. Steele's temporary disability finding, was evidence supporting Dr. Kalata's functional assessment, but fails to state why such evidence supports a finding that Plaintiff is incapable of full-time work for at least twelve continuous months. As such, to the extent the ALJ may have incorrectly diminished the weight of Dr. Kalata's findings, the court finds such error to be harmless. *See Brown v. Astrue*, 649 F. 3d 193, 195 (3d Cir. 2011) (despite

---

[6] As to Dr. Kalata's evidence, the ALJ opined:
> As for the opinion evidence, the undersigned gives little weight to the opinion of the consultative examiner, who found that the claimant would be able to lift more than 10 pounds occasionally and 2-3 pounds frequently; unable to stoop, crouch, or balance; and would be limited to occasional bending, kneeling, and climbing. Although Dr. Kalata examined the claimant, he is not a treating source and his findings are not consistent with the other evidence of record. The other evidence, which shows less limited functioning, comes from treating sources and is more recent than the consultative examination.

R. at 19.

The consultative exam occurred in January of 2008, two and a half years before the ALJ's opinion was issued.

16

the technical correctness of a claimant's argument, an error is harmless when there is no set of facts upon which a recovery may be had).

As to the issue of new evidence, Plaintiff failed to adequately articulate why new evidence in the form of more recent x-rays of his right knee and spine merit remand. A claimant may submit such new evidence to the Appeals Council for consideration so long as it is material to the period of alleged disability on or before the date of the ALJ's hearing. *Matthews v. Apfel*, 239 F. 3d 589, 592 (3d Cir. 2001); 20 C.F.R. §§ 404.970(b), 416.1470(b). If the new evidence meets the requirements for review, the Appeals Council must evaluate the new evidence with the prior evidence on record as a whole to determine if the ALJ's decision was supported by substantial evidence. *Id*. However, the Appeals Council may decline review if the ALJ's decision is not at odds with the weight of the evidence on record. *Id*.

Where the Appeals Council denies review, the ALJ's determination is conclusive and final. *Sims v. Apfel*, 530 U.S. 103, 106 – 07 (2000); 42 U.S.C. § 405(g). In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Matthews*, 239 F. 3d at 594 – 95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supports an ALJ's determination. *Id*.

A district court is not bound by regulation when reviewing an ALJ's decision, but is instead bound by the Act. 42 U.S.C. § 405(g) states that a "court shall have power to enter, upon *the pleadings and transcript of record*, a judgment affirming, modifying, or reversing a decision of the Commissioner." *Matthews*, 239 F. 3d at 594 (citing *Jones v. Sullivan*, 954 F. 2d 125, 128 (3d. Cir. 1991) ("Because . . . evidence was not before the ALJ, it cannot be used to argue that the ALJ's decision was not supported by 'substantial evidence.'")). A district court will not,

therefore, directly consider new evidence, but instead remand for consideration "by the forum which is entrusted by the statutory scheme for determining disability *vel non*." *Matthews*, 239 F. 3d at 594.

In order to remand, however, a claimant must make an appropriate request. *Matthews*, 239 F. 3d at 592. The claimant must satisfy three requirements in order for a district court to remand. *Id*. at 594. First, new evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Szuback v. Secretary of Health and Human Services*, 745 F. 2d 831, 833 (3d Cir. 1984). Second, new evidence must also be "material," in that it is relevant to the time period and physical impairment(s) under consideration, it is probative, and it is reasonably possible that such evidence would have changed the ALJ's decision if presented earlier. *Id*. Third, "good cause" must be shown for not submitting the evidence at an earlier time. *Id*. The court demands these three showings be made to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews*, 239 F. 3d at 595 (citing *Szubak*, 745 F. 2d at 834). The court wishes to promote the presentation of all material evidence before the ALJ, as soon as possible. *Id*. at 594 – 95.

Presently, while Plaintiff's x-rays of his right knee and cervical spine (taken on December 23, 2010) are certainly new, they are not material, and good cause was not shown for the failure to produce such evidence earlier. Plaintiff must demonstrate that the x-rays were somehow relevant to the state of Plaintiff's right knee and spine during the time period for which benefits were denied to Plaintiff. Plaintiff openly admits that the x-rays were not obtained until after the ALJ's adjudication. *See Range v. Astrue*, 2009 WL 3448746 at *8 (W.D. Pa. Oct. 21, 2009) (new evidence that post-dated the ALJ's decision was considered immaterial).

Additionally, Plaintiff offers no reason as to why said x-rays were not obtained sooner, and makes no argument demonstrating how such evidence would have changed the ALJ's decision if presented earlier. Thus, Plaintiff's showing is clearly deficient according to *Matthews* and *Szubak*. Remand for consideration of the new evidence is not warranted.

Lastly, the Court declines to find in Plaintiff's favor as to the issue of his age because the decision of the Appeals Council does not constitute the final decision of the Commissioner, and is therefore beyond the purview of this Court. On March 15, 2012, the Appeals Council issued a Notice indicating that they had declined to review the ALJ's disability decision. (R. at 1 – 5). When the Appeals Council denies review, the decision of the ALJ constitutes the final decision of the Commissioner of Social Security, and is binding. *Sims*, 530 U.S. at 106 – 07; *Matthews*, 239 F. 3d at 592; 20 C.F.R. §§ 404.900(a)(4) – (5), 416.1400(a)(4) – (5), 404.955, 416.1455, 404.981, 416.1481, 422.210(a). 42 U.S.C. § 405(g) and (h) only allow for review of a final decision of the Commissioner by a federal court. "No statutory authority (the source of the district court's review) authorizes the court to review the Appeals Council decision to deny review." *Matthews*, 239 F. 3d at 594. As such, the determination of the Appeals Council to deny review – and in effect fail to consider whether Plaintiff would be disabled under 20 C.F.R., Pt. 404, Subpt. P, App'x 2, Rule 201.14 as of the time of its decision, due to his age – is not reviewable by this Court. Plaintiff's argument in this regard affords him no relief.

C. **CONCLUSION**

Based upon the foregoing, the ALJ supported his decision with substantial evidence. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be

denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

March 19, 2013

*s/ Susan Paradise Baxter*
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.